[Tagged]



**ORDERED in the Southern District of Florida on March 25, 2013.**

**Erik P. Kimball, Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                          Case No.: 09-15556-EPK
                                                Chapter 7
KANE & KANE, A PARTNERSHIP,

    Debtor.
_____/

MICHAEL R. BAKST, Trustee in
Bankruptcy for KANE & KANE, A
PARTNERSHIP,

    Plaintiff,
v.                                              Adv. Proc. No.:10-01022-EPK

UNITED STATES OF AMERICA,

    Defendant.
_____/

## MEMORANDUM OPINION

    This matter came before the Court for trial on November 5 and November 7,

2012.  The Court considered the evidence admitted at trial and the arguments of

counsel.  This memorandum opinion constitutes the Court's findings of fact and conclusion of law in accordance with Fed. R. Civ. P. 52, made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052.  As stated more fully below, the plaintiff did not meet his burden of proof on any claim presented in the Complaint and so judgment will be entered in favor of the defendant.

**BACKGROUND**

On January 7, 2010, Michael R. Bakst, as Trustee (the "Plaintiff") of the bankruptcy estate of Kane & Kane, a Partnership (the "Debtor"), filed a four-count Complaint against the defendant United States of America (the "Defendant" or the "IRS").  In the Complaint, the Plaintiff seeks: (a) in Count I (Actual Fraud) avoidance and recovery of certain transfers to the Defendant under 11 U.S.C. §§ 544(b), 548(a)(1)(A) and 550, and Fla. Stat. §§ 726.105(1)(a) and 726.108(1); (b) in Count II (Constructive Fraud) avoidance and recovery of certain transfers to the Defendant under 11 U.S.C. §§ 548(a)(1)(B) and 550; (c) in Count III (Constructive Fraud) avoidance and recovery of certain transfers to the Defendant under 11 U.S.C. §§ 544(b)(1) and 550, and Fla. Stat. §§ 726.105(1)(b), 726.106(1) and 726.108; and (d) in Count IV, recovery of the avoided transfers pursuant to 11 U.S.C. § 550.

The Debtor was a general partnership formed in the mid-1990s pursuant to Fla. Stat. §§ 620.81001 *et seq*.  The Debtor operated as a law firm specializing in plaintiffs' personal injury protection litigation, representing primarily medical service providers.  Charles J. Kane and Harley N. Kane (together, the "Kanes") were the Debtor's only equity partners.

This adversary proceeding focuses on six monetary transfers (the "Transfers") made by the Debtor to the Defendant between April 14, 2008 and October 17, 2008. In each instance, funds were paid directly from the Debtor's operating account at the direction of one or both of the Kanes and were received and applied by the Defendant in satisfaction of the Kanes' personal income tax obligations. The Transfers aggregate $727,871.90.  Although not an exclusive practice, the Kanes had numerous times paid their personal income tax liabilities and various other personal obligations by directing the Debtor to issue checks payable to the Defendant and other parties.  The Debtor's accounting records reflect each of such payments, including the Transfers, in the relevant partner capital account as distributions to the Kanes.

The Transfers were as follows:

| Date | Tax Amount Paid | Taxpayer |
|------|-----------------|----------|
| April 14, 2008 | $310,000.00 | Charles J. Kane |
| April 14, 2008 | $290,000.00 | Harley N. Kane |
| August 28, 2008 | $7,706.00 | Charles J. Kane |
| September 15, 2008 | $60,000.00 | Charles J. Kane |
| September 15, 2008 | $60,000.00 | Harley N. Kane |
| October 7, 2008 | $165.90 | Charles N. Kane |

On June 18, 2004, the law firms of Stewart Tilghman Fox & Bianchi, P.A., William C. Hearon, P.A., and Todd S. Stewart, P.A. (collectively, "Stewart") filed a lawsuit (the "Stewart Litigation") in Palm Beach Circuit Court (the "State Court") against the Firm, the Kanes and others. The Stewart Litigation proceeded to a bench trial between September and November of 2007 on claims of fraudulent inducement, quantum meruit/unjust enrichment and constructive trust.  Stewart

asked the State Court to enter judgment against the Debtor in the amount of $5,250,000.00, plus prejudgment interest, less an acknowledged set-off of $1,130,884.80. The Debtor contended it was not liable for any sums and asked the State Court to enter judgment in its favor and against Stewart. The State Court took the matter under advisement at the conclusion of trial.

On April 14, 2008, while the Stewart Litigation was still under advisement, the Debtor made the first two of the Transfers to the Defendant.

On April 24, 2008, the State Court entered a final judgment against the Debtor and the Kanes, jointly and severally, for $2,000,000.00, plus prejudgment interest of $769,534.25, for a total of $2,769,534.25 (the "Stewart Judgment").

On May 5, 2008, the Debtor filed in the State Court a motion for reconsideration and for a new trial. While that motion was pending before the State Court, the Debtor made the remaining Transfers to the Defendant.

On November 7, 2008, the State Court entered an order denying the Debtor's motion for rehearing and for a new trial. For the first time on that date the Stewart Judgment became enforceable against the Debtor and the Kanes.

Ten days later, on November 17, 2008, the Debtor and the Kanes filed chapter 11 petitions in this Court. Stewart filed a motion to dismiss the chapter 11 cases as having been filed in bad faith. After an evidentiary hearing, this Court ruled on March 20, 2009 that the chapter 11 petitions of the Debtor and the Kanes were filed in bad faith and dismissed the cases effective March 30, 2009.

The Debtor and the Kanes filed chapter 7 petitions on March 30, 2009. This

adversary proceeding is filed in the Debtor's chapter 7 case.

In the *Order on Motions for Summary Judgment* [ECF No. 297], this Court previously determined that the Defendant is an "initial transferee" within the meaning of 11 U.S.C. § 550(a)(1) and thus the Defendant cannot rely on the defense presented in 11 U.S.C. § 550(b).

## CONSTRUCTIVE FRAUD

The Plaintiff presented fraudulent transfer claims under the constructive fraud provisions of 11 U.S.C. § 548(a)(1)(B) and, through the application of 11 U.S.C. section 544(b)(1), Fla. Stat. §§ 726.105(1)(b) and 726.106(1). The Plaintiff seeks to recover the Transfers under 11 U.S.C. § 550 and Fla. Stat. § 726.108. These claims were stated in Counts II and III of the Complaint.

Section 548(a)(1)(B) of the Bankruptcy Code provides:

(a) (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

5

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

Section 726.105(1)(b), Florida Statutes provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Section 726.106(1) of the Florida Statutes provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

It appears that the Plaintiff intended to present claims under 11 U.S.C. §§ 548(a)(1)(B)(ii)(I) and (II), and parallel provisions of Fla. Stat. §§ 726.105(1)(b)(1) and 726.106(1), requiring proof that the Debtor was insolvent at the time of the Transfers or proof that the Debtor was engaged in a business or transaction after which the Debtor would be left with an unreasonably small capital. The Plaintiff

presented no evidence on 11 U.S.C. §§ 548(a)(1)(B)(III) or Fla. Stat. § 726.105(1)(b)(2), requiring proof that the Debtor intended to or believed it would incur debts that it would be unable to pay, nor did the Plaintiff present evidence on 11 U.S.C. § 548(a)(1)(B)(IV) that the Transfers were for the benefit of an insider, under an employment contract, and not in the ordinary course of business. Although arguably presented in the Complaint, these alternative theories were not presented by the Plaintiff at trial and are not considered here.

To recover under either 11 U.S.C. § 548(a)(1)(B)(ii)(I) or Fla. Stat. § 726.106(1), the Plaintiff must prove that (a) the Transfers were of an interest of the Debtor in property; (b) the Transfers were made within 2 years of the filing of the petition; (c) the Debtor received less than reasonably equivalent value in exchange for the Transfers; and (d) the Debtor was insolvent on the dates of the Transfers or became insolvent as a result of the Transfers.  To recover under 11 U.S.C. § 548(a)(1)(B)(ii)(II) or Fla. Stat. § 726.105(1)(b)(1), rather than insolvency the Plaintiff must prove that the Debtor was left with an unreasonably small capital.

There is no dispute that the Transfers were of an interest of the Debtor in property, that the Transfers were made within the relevant time prior to the filing of the petition, and that there is a creditor that could be able to avoid the Transfers under Florida law.  The parties dispute whether the Debtor received less than reasonably equivalent value in exchange for the Transfers, whether the Debtor was insolvent on the dates of the Transfers or became insolvent as a result of the

Transfers, and whether the Debtor was left with an unreasonably small capital after the Transfers.

**INSOLVENCY**

The six Transfers at issue in this case were made over a period of months from April 14, 2008 through October 7, 2008.  For convenience, both parties focused their analysis of the Debtor's solvency on two dates:  April 13, 2008 (a date after completion of trial in the State Court but prior to the entry of the Stewart Judgment) and September 14, 2008 (a date after the entry of the Stewart Judgment but prior to it becoming enforceable as a result of denial of the Debtor's motion for reconsideration and for new trial).

To prove that the Debtor was insolvent on the relevant dates, the Plaintiff offered the testimony and expert witness reports of Robert W. Zucker, CPA/CFF. Mr. Zucker opined that the Debtor was insolvent on the dates of the Transfers to the Defendant.

Fla. Stat. § 726.103(1) defines insolvency for purposes of fraudulent transfer analysis.  It states: "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."  Fla. Stat. § 726.103(3) further refines this definition for general partnerships, such as the Debtor.  It states: "A partnership is insolvent under subsection (1) if the sum of the partnership's debts is greater than the aggregate, at a fair valuation, of all of the partnership's assets and the sum of the excess of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts."   The relevant provisions of the

Bankruptcy Code are essentially identical.  11 U.S.C. § 101(32) defines the term "insolvent" with regard to a partnership as the "financial condition such that the sum of such partnership's debts is greater than the aggregate of, at a fair valuation -- (i) all of such partnership's property . . . ; and (ii) the sum of the excess of the value of each general partner's nonpartnership property . . .  over such partner's nonpartnership debts."

Under both federal and Florida law, when determining the solvency of a partnership the Court starts with the partnership's own assets and liabilities.  If the partnership is solvent, the general partners' finances are not considered.  If the partnership's liabilities exceed its assets, then the Court may consider the finances of the general partners, but only to the extent a general partner has assets of a value exceeding his or her personal liabilities.  That is, the net assets of a general partner may be used to bolster the assets of a partnership, but if a partner has net liabilities these are not taken into account at the partnership level.  The Court does not simply aggregate the assets and liabilities of the partnership and its general partners.

Thus, in this case, the Court must first determine whether the Debtor, a general partnership, was insolvent on the dates of the Transfers based solely on the Debtor's assets and liabilities.  The Court will include any net assets of the Debtor's general partners, the Kanes, only if necessary to augment the Debtor's assets.

In the course of litigation in this case, Mr. Zucker tendered three written expert witness reports:  Exhibit 12, which was not offered at trial; and Exhibits 47

and 49, which were admitted at trial. Exhibits 47 and 49 were initially subject to objections of the Defendant but the objections were withdrawn during trial.

At the time the Defendant deposed Mr. Zucker prior to trial, the only expert witness report timely delivered under this Court's scheduling order was that contained in Exhibit 12. After the Court set the matter for trial, the Plaintiff tendered a supplemental expert witness report of Mr. Zucker, the document eventually admitted as Exhibit 47. Prior to trial, the Defendant moved the Court to prohibit the Plaintiff from presenting Exhibit 47 at trial and to prohibit Mr. Zucker from testifying on those components of his expert opinion reflected in Exhibit 47 that were not already disclosed in Exhibit 12. After a hearing, during which the Court offered to delay trial in order to permit the Defendant to depose Mr. Zucker with regard to the report contained in Exhibit 47, the Defendant elected to move forward with trial without additional discovery.

At trial the Plaintiff offered Exhibit 49, another supplement to Mr. Zucker's expert report. The Defendant had no knowledge of Exhibit 49 prior to the commencement of trial and raised an appropriate objection to its admission. After continued questioning of Mr. Zucker, and colloquy among the Court, counsel for the Plaintiff and counsel for the Defendant, the Defendant withdrew its objection to Exhibit 49 and it was admitted. Following admission of Exhibit 49 at trial, the Plaintiff questioned Mr. Zucker on yet another concept that was not addressed in Exhibit 12, Exhibit 47, or Exhibit 49. This line of questioning was objected to by the Defendant, but the Defendant later withdrew its objection.

The only material evidence offered by the Plaintiff on the issue of the Debtor's insolvency was in the form of testimony of Mr. Zucker and his written reports. To understand the Court's ruling on the issue of insolvency, it is useful to walk through the analyses presented by Mr. Zucker in each of his written reports and the additional testimonial evidence he offered at trial.

Mr. Zucker's original report, contained in Exhibit 12 (not admitted), is dated February 7, 2011. In this initial report, Mr. Zucker opined that the Debtor and its two general partners were, in the aggregate, insolvent on both April 13, 2008 and September 14, 2008. While the report includes tables that calculate the solvency of the Debtor, Charles Kane, and Harley Kane independently, the opinion stated in the report treats them as a single entity for purposes of the insolvency analysis. As noted above, this approach is not consistent with either federal or Florida law.

Mr. Zucker's initial report includes a table showing the assets and liabilities of the Debtor alone. This table indicates that on both April 13, 2008 and September 14, 2008 the Debtor was insolvent. This conclusion, however, is based on obviously faulty assumptions.

In this case, the solvency analysis centers on two components of the Debtor's adjusted balance sheet. The first is the value of the Debtor's work in progress, often referred to by the parties as the Debtor's "book of business." The Debtor was an operating law firm with approximately 1,000 open client matters on each of the relevant dates. Rather than analyze the value of this book of business in any detail, in his initial report Mr. Zucker assumed that its value was equal to the Debtor's

11

actual cash collections during the 60 day period after each of April 13, 2008 and September 14, 2008.  There is no rationale provided for this apparently random approach to valuing the Debtor's substantial book of business.

The second major component of the solvency analysis here is the valuation of the claim represented by the Stewart Litigation.  The Stewart Judgment was entered after the first two Transfers.  It was subject to a motion for rehearing that was not determined until after all of the Transfers were effected.  The result is that this liability, by far the most significant liability of the Debtor, was contingent on the date of each of the Transfers.  That is, at all times relevant to this case, the liability represented by the Stewart Litigation and the Stewart Judgment was not an absolute liability due and payable by the Debtor.  It became so only when the State Court denied the Debtor's motion for rehearing, after all the Transfers had been made.  In Mr. Zucker's initial report, in determining a value for this contingent liability he assigned a 50% probability of success in the Stewart Litigation.  There is no explanation for this seemingly random multiplier in Mr. Zucker's original report. The Court notes that an extremely similar report by Mr. Zucker was criticized by this Court in prior litigation between Stewart and the Kanes.  *Stewart Tilghman Fox & Bianchi, P.A. v. Kane (In re Kane)*, 470 B.R. 902. 922-25 (Bankr. S.D. Fla. 2012).  Apparently recognizing the shortcomings in Mr. Zucker's original expert witness report, although included in the Plaintiff's exhibit binders the Plaintiff did not seek its admission at trial.

Mr. Zucker's second expert witness report, admitted as Exhibit 47, is not a significant improvement.  Again, Mr. Zucker's opinion of insolvency on the relevant dates is based on an aggregation of the assets and liabilities of the Debtor and the Kanes, an approach not consistent with the requirements of federal or Florida law.

Mr. Zucker's second report includes separate data for each of the Debtor, Charles Kane, and Harley Kane.  Thus, it is possible to analyze the Debtor's solvency based on its own assets and liabilities as determined by Mr. Zucker.  As of September 14, 2008, Mr. Zucker's own data shows that the Debtor was solvent by approximately $110,000 or about 3.8% of its total liabilities.  As of April 13, 2008, Mr. Zucker's tables might lead one to conclude that the Debtor was insolvent, its liabilities exceeding its assets by a wide margin of approximately $2.4 million.  But this conclusion would be based on a significant error.  The Stewart Litigation involved two alternative theories for relief on the same claim -- fraud and unjust enrichment.  While both theories were presented at trial, Stewart could recover under only one of the two theories.  However, in determining the value of the contingent liability represented by Stewart Litigation, Mr. Zucker obtained information about the value of the two alternative theories for relief and aggregated the resulting figures for purposes of his analysis.  That is, in this second report Mr. Zucker assumed that Stewart could recover on <u>both</u> the fraud and unjust enrichment claims, a result not actually possible in the Stewart Litigation.  As a result, Mr. Zucker's valuation for the contingent liability represented by the Stewart Litigation, as of April 13, 2008, is grossly exaggerated.

Apparently realizing some of the errors contained in Mr. Zucker's second expert witness report, for the first time at trial the Plaintiff submitted a third supplement to his expert witness report, eventually admitted as Exhibit 49. Yet again, the solvency analysis impermissibly combines the assets and liabilities of the Debtor and the Kanes.

Mr. Zucker's third report, presented as a substitute exhibit to his second report, includes tables indicating the assets and liabilities of the Debtor, separate from the Kanes. Mr. Zucker's presentation of the Debtor's assets and liabilities as of September 14, 2008 is the same as that presented in his second report. The Debtor was marginally solvent on that date. Realizing that he had inappropriately combined the fraud and unjust enrichment claims for purposes of valuing the contingent liability represented by the Stewart Litigation, in this third report Mr. Zucker presents each theory of recovery in an independent table. The result, under either theory of recovery in the Stewart Litigation, is that as of April 13, 2008 the Debtor was solvent by a wide margin. Mr. Zucker's own data in his third report shows that the Plaintiff cannot succeed on any claim that requires the Plaintiff to prove that the Debtor was insolvent on the dates of the Transfers.

When it was pointed out at trial that Mr. Zucker's analysis did not support a finding that the Debtor was insolvent on the date of any of the Transfers, the Plaintiff offered Mr. Zucker's testimony that the value of the Debtor's book of business on each relevant date should be reduced to reflect the delay in collection. Mr. Zucker testified that he would apply a 10% discount rate to the gross value of

the Debtor's book of business, and that this would reduce the value of this primary asset such that the Debtor would be insolvent on the relevant dates (under most circumstances).  The Defendant properly objected to this testimony, which was heard subject to later ruling on the objection.

The Court rejects Mr. Zucker's testimony regarding the application of a discount rate to the value of the Debtor's book of business for two reasons.  First, this testimony represented a substantial change to his expert opinion compared even to the third of his tendered expert witness reports, Exhibit 49, first seen by the Defendant on the initial day of trial.  This new component of Mr. Zucker's opinion, which would be necessary to reach the conclusion that the Debtor was insolvent and thus would be a key element in the Plaintiff's case, was not disclosed to the Defendant at any time prior to trial.  If Mr. Zucker had previously included in his pre-trial written report an analysis of the value of the Debtor's book of business that reflected a calculation of its present value on the relevant dates, the Defendant could have questioned him with regard to the appropriate discount rate or rates and the application of such rates to the various outstanding client matters of the Debtor. Depending on the breadth of the pending client matters, both with regard to their progress and the nature of the legal matters involved, this analysis could be quite complex.  The Defendant had absolutely no warning that Mr. Zucker would add this aspect to his expert opinion.   Mr. Zucker's testimony on the present value calculation is excluded on this basis alone.

Second, even if the Court were to consider Mr. Zucker's testimony with regard to the present value of the Debtor's book of business, the Court would give it no weight as Mr. Zucker's testimony on this issue lacked credibility. The Court notes that, according to Mr. Zucker, during the lunch break he managed to perform a weighted analysis of the Debtor's approximately 1,000 open client matters as of the two relevant dates and apply what he said was an appropriate discount rate based on his experience with interest rates on lines of credit. This analysis resulted in a modification of his determination as to the value of the Debtor's assets sufficient for him to conclude that the Debtor was insolvent (under most circumstances) on the relevant dates. Mr. Zucker's explanation of his approach to calculating the present value of the Debtor's book of business was sketchy and his selection of a seemingly arbitrary discount rate of 10% was not well supported. To put it plainly, Mr. Zucker's testimony on this issue appeared to be a desperate effort to bolster the Plaintiff's failed attempt to prove that the Debtor was insolvent on the relevant dates.

The Plaintiff did not meet its burden to prove that the Debtor was insolvent on the dates of any of the Transfers. The Plaintiff may not recover under those components of Counts II, III, and IV presenting claims under 11 U.S.C. § 548(a)(1)(B)(ii)(I) or Fla. Stat. § 726.106(1).

**UNREASONABLY SMALL CAPITAL**

To recover under 11 U.S.C. § 548(a)(1)(B)(ii)(II) or Fla. Stat. § 726.105(1)(b)(1), made applicable by 11 U.S.C. § 544(b), the Plaintiff must prove

that the relevant Transfer left the Debtor with unreasonably small capital. The federal and Florida statutory standards are very similar. 11 U.S.C. § 548(a)(1)(B)(ii)(II) requires the Plaintiff to prove that the Debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital." Fla. Stat. § 726.105(1)(b)(1) requires the Plaintiff to prove that the Debtor "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction."

Whether a transfer or obligation leaves a debtor undercapitalized is a question of fact to be determined on a case-by-case basis. *Smith v. Litchford & Christopher, P.A. (In re Bay Vista of Va., Inc.)*, 428 B.R. 197, 225-26 (Bankr. E.D. Va. 2010). Unreasonably small capital refers to the inability to generate sufficient profits to sustain operations. *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992). "Because an inability to generate enough cash flow to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital would seem to encompass financial difficulties short of equitable [in]solvency." *Id.* "[T]he 'unreasonably small capital' test of financial condition is 'aimed at transferees that leave the transferor technically solvent but doomed to fail.'" *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009) (citations omitted).

17

In determining whether a debtor was left with unreasonably small capital, the Court often is called upon to review a debtor's historic and contemporaneous business activities, the ebb and flow of income and expense over time, the availability of additional capital or lines of credit, the prospect for new business, and a variety of inter-related issues that affect whether the enterprise will continue. To meet the burden of proof on this issue often requires expert testimony and/or substantial financial data from which the Court may ascertain the debtor's capital structure and business prospects around the time of the transfers in question. *See Kipperman*, 411 B.R. at 836-37; s*ee also In re TOUSA, Inc.*, 680 F.3d 1298, 1303 (11th Cir. 2012); *United States v. Menotte*, 484 B.R. 835 (S.D. Fla. 2012); *Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 396-98 (S.D. Tex. 2008); *Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 76-77 (Bankr. N.D. Ill. 2002); *Official Comm. of Unsecured Creditors of Toy King Distribs., Inc. v. Liberty Savs. Bank, FSB (In re Toy King Distribs., Inc.)*, 256 B.R. 1, 142 (Bankr. M.D. Fla. 2000). The Court should consider "all reasonably anticipated sources of operating funds, which may include new equity infusions, cash from operations, or cash from secured or unsecured loans over the relevant time period." *Moody*, 971 F.2d at 1072 n.24 (*quoting* Markell, *Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital*, 21 Ind. L. Rev. 469, 496 (1988)).

In a typical case where the question of unreasonably small capital is presented, the evidence before the Court will be quite detailed. In this case, the Plaintiff pointed only to the testimony of Charles Kane and to the existence and

eventual enforceability of the Stewart Judgment.  The Court also reviewed the testimony elicited by the Plaintiff from Harley Kane as well as the financial documents admitted into evidence.  From the Kanes' testimony one might infer that the Debtor suffered some delay in paying its bills from time to time during the period covered by the Transfers, that at one point the Debtor borrowed $200,000 on a line of credit in part to allow the Debtor to make some of the Transfers, and that the Debtor was unable to pay the Stewart Judgment in full when it was entered.  Yet the evidence also shows that the draw on the Debtor's line of credit was repaid, that the Debtor paid its obligations other than the Stewart Judgment, and that the Stewart Judgment was not payable under Florida law until after all of the Transfers were made.  On careful review of the testimony of the Kanes relating to the Debtor's business prospects, it is often not clear what time frame is referred to. The Court cannot tell whether they were testifying about a period prior to, during, or after the Transfers were completed.  The evidence offered on this issue was meager—it would require a good deal of extrapolation to flesh out the Plaintiff's case here.  The quantum of evidence is not sufficient to meet the Plaintiff's burden.[1]

---

[1] The evidence also shows that the Debtor had substantial ongoing business during the time of the Transfers, that the Debtor was a successful law firm with significant revenues, and that it appeared that the Debtor would remain in business indefinitely.  This was certainly the expectation of the Kanes.  The Stewart Litigation was complete prior to any of the Transfers, and the Stewart Judgment had been issued but was not enforceable at the time of the remaining Transfers. Nevertheless, when viewed from the time of the Transfers, one could have projected that the Debtor would either be successful in overturning the Stewart Judgment on appeal or, more likely, in working out a feasible payment arrangement with Stewart.  The Kanes were not successful in overturning the Stewart Judgment, nor did they negotiate a settlement with Stewart, but these are facts not known in 2008 and should not be weighed in the analysis.  In the end, the Court does not

Even if the evidence offered was material to the issue of whether the Debtor suffered from an unreasonably small capital around the time of the Transfers, the relevant legal standards do not support relief in favor of the Plaintiff.  Under both federal and Florida law, there must be a causal relationship between the Transfers and the likelihood that the Debtor's business will fail.  The Plaintiff argued that the existence of the Stewart Litigation and the entry of the Stewart Judgment resulted in the inevitable failure of the Debtor.  If the Debtor's failure was caused by the Stewart Judgment it was not caused by the Transfers.  If a debtor is doomed to fail prior to a transfer, the transfer does not create the likelihood of such failure, and the statutory test is not satisfied. *Pioneer Home Builders, Inc. v. Int'l Bank of Commerce*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992).  A debtor's later failure, alone, is not dispositive on this issue.  The Court's analysis must be done as of the time of the transfers in question. *Moody*, 971 F.2d at 1073-74; *Kipperman*, 411 B.R. at 836.

The Plaintiff did not prove that the Debtor was left with an unreasonably small capital after any of the Transfers.  The Plaintiff may not recover under those components of Counts II, III, and IV stating claims under 11 U.S.C. § 548(a)(1)(B)(ii)(II) or Fla. Stat. § 726.105(1)(b)(1).

**REASONABLY EQUIVALENT VALUE**

Even if the Plaintiff had proven either that the Debtor was insolvent on the dates of the Transfers or that the Debtor was left with an unreasonably small

---

have sufficient data to determine whether the Transfers left the Debtor unable to continue in business.

capital after the Transfers, the Plaintiff would need to prove that the Debtor did not receive reasonably equivalent value in exchange for the Transfers.

For this purpose, the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor."  11 U.S.C. § 548(d)(2)(A). Under Florida law, "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."  Fla. Stat. § 726.104.  "By its terms and applications, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.),* 490 F.3d 1325, 1336 (11th Cir. 2007) (citation omitted). The Plaintiff may not avoid the Transfers if the Transfers conferred an economic benefit upon the Debtor, either directly or indirectly. *Gen. Elec. Credit Corp. of Tenn. v. Murphy (In re Rodriguez),* 895 F.2d 725 (11th Cir.1990); *see also In re Advanced Telecomm. Network, Inc.,* 490 F.3d at 1336 ("benefit received need not be entirely 'direct' "); *Bakst v. United States (In re Kane & Kane)*, 479 B.R. 617, 628 (Bankr. S.D. Fla. 2012).

The Debtor transferred $727,871.90 to the Defendant.  The Debtor did not owe the taxes it paid.   Thus, the Debtor received no direct benefit as a result of the Transfers to the Defendant.  This is as far as the Plaintiff must go to meet its initial burden on the issue of reasonably equivalent value.

The Defendant asserts that the indirect benefit rule applies in this case. Under the indirect benefit rule, if the Transfers produced a concomitant economic

benefit that ultimately flowed to the Debtor, even though the consideration did not flow directly to the Debtor, the Debtor received reasonably equivalent value and the Transfers cannot be avoided. *Pummill v. Greensfelder, Hemker & Gale (In re Richards & Conover Steel, Co.),* 267 B.R. 602, 613–14 (8th Cir. BAP 2001).   The burden of proving this indirect benefit lies with the Defendant. *Kapila v. Clark (In re Trafford Distrib. Ctr., Inc.),* 431 B.R. 263, 299 (Bankr. S.D. Fla. 2010); *Unencumbered Assets Trust v. Biomar Techs., Inc. (In re Nat'l Century Fin. Enters., Inc.)*, 341 B.R. 198, 216-18 (Bankr. S.D. Ohio 2006).

The Defendant argued that the value of the services performed by the Kanes for the Debtor was reasonably equivalent to the value of the Transfers and other distributions made by the Debtor to or for the benefit of the Kanes.  In this regard, the Defendant offered the expert witness report and deposition testimony of James Reda.  Mr. Reda is a consultant specializing in executive compensation.  Mr. Reda opined that the Debtor received reasonably equivalent value in exchange for the Transfers in the form of services rendered by the Kanes.[2]

---

[2] The Court notes that the analysis of whether an allegedly fraudulent transfer was made in exchange for reasonably equivalent value typically focuses on value obtained by the transferor at a time consequent to the transfer.  Here, rather than look to value obtained by the Debtor as a result of and immediately after each Transfer, the Defendant presented data relevant to the entire year 2008.  As the Transfers are a component of the compensation of the Kanes by the Debtor, their work was closely intertwined with the overall business and success of the Debtor, and both their work and the Transfers and other distributions made to them and on their behalves took place on many dates throughout the year, it may be appropriate to consider whether there was reasonably equivalent value by looking at the entire year.  The Court wonders, however, whether facts not known to the Court might place such an approach in doubt.  It is possible, for example, that the value of the work done by the Kanes was greater at one time of year than another, and that the Transfers and other distributions were not closely aligned with the Kanes' valuable work.  Such facts might be material to the Court's analysis of reasonably equivalent value.  In this case, it is not necessary for the Court to make too fine a point on this issue, as in the end the Defendant did not present sufficient evidence of indirect benefit to meet its burden.

Mr. Reda started his analysis with information obtained from the 2009 Am Law 100 Survey, a survey that presents data on revenues and compensation of partners at the 100 largest law firms in the United States.  Even if the data Mr. Reda obtained from the 2009 Am Law 100 Survey is useful here,[3] Mr. Reda's analysis of it is incomplete and misleading in light of the facts of this case.

Mr. Reda began by calculating a compensation ratio for partners at the Am Law 100 firms for the year 2007 (the year prior to the Transfers) and the year 2008 (the year of the Transfers).  He did this by taking the aggregate compensation of partners at the law firms listed in the Am Law survey and dividing the result by the aggregate gross revenues of the listed firms.  Mr. Reda determined that the average compensation ratio for partners at the Am Law 100 firms was 44%.  By doing the same analysis for each of the Am Law 100 firms, Mr. Reda determined that their median compensation ratio was 43%.

Mr. Reda then attempted to calculate the compensation ratio for the Debtor's partners, Charles and Harley Kane, for 2008, the year of the Transfers.  According to Mr. Reda's calculations, in 2008 the Kanes received compensation from the Debtor such that their compensation ratio was only 19%, or significantly below the Am Law 100 median of 43%.  Because the compensation received by the Kanes took into account the Transfers and other distributions made to or for the benefit of the

---

[3] The Court notes that the financial performance of the largest law firms in the country might differ significantly from the financial performance of a two partner local firm such as the Debtor.  The enormous law firms included in the Am Law 100 survey are not simply scaled up versions of a small office.  Although Mr. Reda attempted to address this concern by using the Am Law 100 data to calculate a compensation ratio, which he then applied to the Debtor, it is unclear whether such extrapolation was reasonable under the circumstances.  The Court simply does not have sufficient information on how the data in the Am Law 100 survey was obtained or of the components of each data point.  Mr. Reda did not address this in any detail.

Kanes, Mr. Reda testified that the Debtor received more than reasonable value for their services when it made the Transfers.

To reach this conclusion, Mr. Reda relied on the Debtor's ordinary business income for 2008 as shown on the Debtor's 2008 federal tax return. The Debtor, being a general partnership, was a pass-through entity for federal tax purposes. The Debtor's ordinary business income was identical to the partner income obtained by the Kanes for tax purposes. For 2008, the Schedules K-1 to the Debtor's tax return indicated aggregate partner income of $347,669. Mr. Reda divided this figure by the Debtor's reported gross revenue, $1,818,506, to obtain a 19% compensation ratio. Yet it is obvious that the Kanes actually received much more value from the Debtor in 2008 than the $347,669 reflected as the Debtor's ordinary business income. The Transfers alone aggregate $727,871.90, more than twice the aggregate partner income used by Mr. Reda in his calculation. Indeed, the Debtor's Schedules K-1 for 2008 indicate an aggregate of more than $1.3 million in withdrawals and distributions (apparently including the Transfers). If Mr. Reda had used this figure as the aggregate compensation to the Kanes for purposes of his calculation, the resulting compensation ratio would be 71%, markedly higher than the Am Law 100 median of 43%.[4] Mr. Reda's analysis on this issue was not reliable and is not useful to the Court in this case.

---

[4] According to Mr. Reda's report, the information set out in the Am Law 100 survey consists primarily of self-reported data from the subject law firms. From the presentation in Mr. Reda's report, it is impossible to tell what makes up any component of the data. For example, are the figures shown for "Aggregate Compensation Partners," a key component of Mr. Reda's analysis, reflective of any and all value actually obtained by the partners in those firms, including such things as health insurance and other indirect benefits? Or do those sums reflect only amounts that constituted direct payments to the partners for salary, distributions, or bonuses? It seems likely,

Mr. Reda also opined that the services rendered by the Kanes to the Debtor were equivalent in value to the compensation they received, including the Transfers.  This is the converse of Mr. Reda's opinion that the value received by the Kanes was equivalent to the value they gave to the firm.  In rendering this opinion Mr. Reda did not attempt to determine the market value of such services.  Instead, Mr. Reda pointed to the fact that the success of the Debtor depended entirely on its two partners, the Kanes, who were lawyers of significant experience, that they ran the firm, and that they were completely devoted to its success.  In closing, following on Mr. Reda's opinion, the Defendant argued that the Debtor would not have existed without the Kanes, that any and all income received by the firm was as a result of their efforts.   The Defendant expressed concern that the Kanes surely could not be required to work for the Debtor and receive nothing from the Debtor in return.  While emotionally attractive, this argument does not follow from logic.  A law firm such as the Debtor is like any other business.  The founders of the business take a risk that the business will not succeed.  There is no guaranty of an income to the Debtor's partners.  If the Kanes' efforts were in fact not sufficient to cause the Debtor to prosper, then those efforts would not be entitled to remuneration.  The fact that the Debtor would not have existed but for the efforts of Charles and Harley Kane does not mean that their efforts resulted in value to the Debtor equal to the compensation they received.

---

given the apparent purpose of the Am Law 100 survey, that this information includes all possible benefits obtained by the partners of the Am Law 100 firms.  If this is the case, it is unclear why Mr. Reda limited his analysis to the aggregate partnership income designated on the Debtor's 2008 tax return, particularly as this figure is essentially a fiction in light of the actual benefit obtained by the Kanes from the Debtor during that year.

The Court did not find Mr. Reda's testimony or written report helpful in this case, and no weight is given to this evidence. The Defendant did not meet its burden in proving that the indirect value obtained by the Debtor was reasonably equivalent to the value given by the Debtor.[5]

## ACTUAL FRAUD

In Count I, the Plaintiff argues that the Debtor made the Transfers with the actual intent to hinder, delay, or defraud creditors. These claims are pursued under 11 U.S.C. § 548(a)(1)(A) and under Fla. Stat. § 726.105(1)(a) pursuant to 11 U.S.C. § 544(b).

11 U.S.C. § 548(a)(1)(A) provides:

The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

**(A)** made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

"Because a debtor is not likely to testify that he had the requisite intent to defraud creditors, the intent to hinder, delay, or defraud can be inferred from extrinsic evidence and the presence of badges of fraud." *Bakst v. Clarkston (In re Clarkston)*, 387 B.R. 882, 887 (Bankr. S.D. Fla. 2008) (citation omitted). "Badges of

---

[5] Because the Court has ruled that the Plaintiff did not meet its burden in proving that the Debtor was insolvent or left with unreasonably small capital, this later ruling has no effect on the outcome of the case.

fraud include: (1) a relationship between the debtor and the transferee; (2) lack of consideration for the conveyance; (3) insolvency or indebtedness of the debtor; (4) the transfer of the debtor's entire estate; (5) reservation of benefits, control or dominion by the debtor; (6) secrecy or concealment of the transaction; and (7) pendency or threat of litigation at the time of the transfer.  While a single badge of fraud may simply raise suspicion, the presence of several badges of fraud, when considered together, may form the basis for a finding of actual fraud." *Id*. (citations omitted).

Fla. Stat. § 726.105(1)(a) provides:

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor.

(2) In determining actual intent under paragraph (1)(a), consideration may be given, among other factors, to whether:

(a) The transfer or obligation was to an insider.

(b) The debtor retained possession or control of the property transferred after the transfer.

(c) The transfer or obligation was disclosed or concealed.

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.

(e) The transfer was of substantially all the debtor's assets.

(f) The debtor absconded.

(g) The debtor removed or concealed assets.

(h) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred.

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The actual fraud provisions under the Bankruptcy Code and the Florida Statutes are substantially identical. It is appropriate for the Court to analyze these claims in tandem.

As the Debtor was a general partnership, the Court looks to the intent of its controlling general partners, the Kanes. The Transfers were made for the benefit of the Kanes, who are insiders of the Debtor. All of the Transfers were made after completion of trial in the Stewart Litigation, and a number of them were made after entry of the Stewart Judgment. On the other hand, the Transfers were properly recorded as distributions to the Kanes, and the Kanes were in fact primarily responsible for the substantial ongoing business of the Debtor. It appears that the Debtor was solvent at the time of all of the Transfers.

The evidence as a whole does not give the Court the impression that Charles or Harley Kane caused the Debtor to make the Transfers with the intent to harm Stewart or any other existing or future creditor of the Debtor. While there was some animus toward Stewart, the greater weight of the evidence does not convince

28

the Court that the Transfers, or indeed any payments made by the Debtor on behalf of the Kanes, were aimed at Stewart or any other creditor.  This conclusion is consistent with the credible testimony of Charles and Harley Kane that they did not cause the Transfers with the intent to favor themselves over any creditor.  It is clear to the Court that the Kanes often caused the Debtor to make payments to the IRS and to pay various other parties on their behalves.  While the Kanes did not always cause the Debtor to pay their personal income taxes, they often did so.  Each of these payments was duly recorded in their individual capital accounts with the Debtor and reflected in the Debtor's tax returns.  This practice was the Debtor's ordinary course of business for years prior to commencement of the Stewart Litigation, and continued during that litigation and through to the filing of the initial bankruptcy petition by the Debtor.  The Debtor's various Transfers on behalf of the Kanes do not bear the hallmark of intentional fraudulent transfers.

The Plaintiff did not meet its burden of proving that any of the Transfers were made with actual intent to hinder, delay or defraud a creditor as required under the Bankruptcy Code or Florida statutes.

**THIS COURT MAY ENTER FINAL JUDGMENT**

In its *Objection by United States of America to Bankruptcy Court's Entry of Final Judgment in this Adversary Proceeding* [ECF No. 265], the Defendant argues that entry of final judgment by this Court would violate Article III of the United States Constitution, citing *Stern v. Marshall*, 131 S. Ct. 2594 (2011).  The

Defendant argues that the Court must file proposed findings of fact and conclusions of law with the district court.[6]

Numerous courts have considered whether the Supreme Court's analysis in *Stern* should be applied in the context of fraudulent transfer actions pursued in bankruptcy cases.  This Court believes that it has the power to enter final judgment in any action brought by a trustee, debtor-in-possession or other authorized party in interest under 11 U.S.C. §§ 548 and/or 544.[7]  *See, e.g., Feuerbacher v. Moser*, No. 11-CV-272, 2012 U.S. Dist. LEXIS 44396 (E.D. Tex. Mar. 29, 2012); *Kelley v. JPMorgan Chase & Co*, 464 B.R. 854 (D. Minn. 2011); *Cardiello v. Arbogast (In re Arbogast)*, 466 B.R. 287 (Bankr. W.D. Pa. 2012); *Zazzali v. 1031 Exchange Group (In re DBSI, Inc.)*, 467 B.R. 767 (Bankr. D. Del. 2012); *Burtch v. Seaport Capital, LLC (In re Direct Response Media, Inc.)*, 466 B.R. 626 (Bankr. D. Del. 2012); *Gugino v. Canyon*

---

[6] For a complete discussion regarding bankruptcy jurisdiction and the interplay with Article III, the Court refers the parties to its recent decision, *British Am. Ins. Co. v. Fullerton (In re British Am. Ins. Co.)*, No. 11-03118, 2013 WL 765373 (Bankr. S.D. Fla. Feb. 28, 2013).

[7] In *Stern v. Marshall*, the Supreme Court held that a bankruptcy court did not have the power, consistent with Article III, to enter final judgment on a state law counterclaim by the estate against a claimant, which counterclaim did not arise from federal bankruptcy law itself and was not necessarily resolved in allowance of the creditor's claim against the estate.  *Stern v. Marshall*, 131 S. Ct. 2594, 2618, 2620 (2011).  In *Stern*, the Supreme Court repeatedly stressed the narrowness of its decision.  *See, e.g., id.* at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented is a 'narrow' one."); ("We conclude today that Congress, in one isolated respect, exceeded that limitation in the Bankruptcy Act of 1984.  The Bankruptcy Court below lacked the constitutional authority to enter a final judgment on a state law counter claim that is not resolved in the process of ruling on a creditor's proof of claim.").  It is well settled in this circuit that fraudulent transfer claims pursued under 11 U.S.C. § 548 or § 544, are core matters subject to final judgment in this Court. *See, e.g., Nordberg v. Granfinanciera, S.A. (In re Chase & Sanborn Corp.)*, 835 F.2d 1341, 1349 (11th Cir. 1988), *rev'd on other grounds*, 492 U.S. 33 (1989); *Andrews v. RBL, L.L.C. (In re Vista Bella)*, No. 12-00060, 2012 Bankr. LEXIS 4014 (Bankr. S.D. Ala. Aug. 30, 2012).  As the Eleventh Circuit recently pointed out, it is not appropriate to extrapolate from a Supreme Court decision, extending its holding in a manner inconsistent with settled circuit law.  *McNeal v. GMAC Mortg., LLC (In re McNeal)*, 477 Fed. Appx. 562, 564 (11th Cir. 2012) ("As we have stated, '[o]bedience to a Supreme Court decision is one thing, extrapolating from its implications a holding on an issue that was not before that Court in order to upend settled circuit law is another thing.'" (*quoting Atl. Sounding Co. v. Townsend*, 496 F.3d 1282, 1284 (11th Cir. 2007))).  This Court declines to extend *Stern* beyond its holding.

*Cnty. (In re Bujak)*, No. 11-6038, 2011 WL 5326038 (Bankr. D. Idaho Nov. 3, 2011);

*Menotte v. United States (In re Custom Contractors, LLC)*, 462 B.R. 901 (Bankr. S.D.

Fla. 2011); *In re Safety Harbor Resort and Spa*, 456 B.R. 703 (Bankr. M.D. Fla.

2011).  The Defendant's objection is overruled.

**CONCLUSION**

For the foregoing reasons, the Plaintiff did not meet its burden on any

component of the Complaint.  Judgment will be entered in favor of the Defendant.

# # #

Copies furnished to:

All parties of record.